BRUCE L. TAGGART, AND HELEN L. TAGGART, APPELLANTS, v. NEVADA TITLE GUARANTY COMPANY, A NEVADA CORPORATION, RESPONDENT.

No. 4226

January 27, 1960                    348 P.2d 749

*Morton Galane,* of Las Vegas, for Appellants.

*Emerson J. Wilson,* of Reno, for Respondent.

## OPINION

By the Court, BADT, J.:

The question presented by this appeal is whether a title company, under escrow instructions requiring a search of title and the issuance of title insurance as a condition for closing of the escrow and which instructions state that the purchase money will be paid "outside of escrow," and having learned through a preliminary search that title insurance would not issue under the existing state of title, and which has not notified the escrow purchaser of such fact, is liable in tort to a purchaser who has made payments "outside of escrow" directly to the seller, resulting in loss to the purchaser.

The district court's judgment held against such tort liability. This ruling is the fundamental basis of appellants' assignment of error. A consideration of the salient facts is necessary.

The record on appeal is encumbered by a mass of testimony and documentary evidence wholly immaterial to the issue. This results from the fact that appellants commenced two actions in the court below. One was against the escrow sellers and their agent, Lucille A. Swital, for a rescission of the contract of sale; the second was against the title company for damages for the alleged tort in neglecting to notify plaintiffs that the title was defective. These two actions were consolidated for trial, resulting in a judgment against the sellers for

rescission as prayed by the contracting purchasers, but denying recovery from the escrow holder for the asserted tort. The sellers and their agent Swital are not parties to this appeal.

Swital, an unlicensed real estate dealer in Las Vegas, inserted an ad in a Los Angeles paper for the sale of a service station on behalf of the Schofields. She was contacted by the Taggarts and a written memorandum entered into as follows:

"Searchlight, Calif., 3/3/56    Received from Bruce L. Taggart, Helen L., $500.00 to apply on purchase price of $25,000 for [property described]. This deal owner will carry back necessary 1st Trust Deed on Bal. Cash $8,800 * * *. $1200 on or about in 2nd Trust Deed on Calif. property. Buyer will deposit an additional $10,300 cash and his necessary instruments in escrow * * *. The seller is to furnish at his expense in said escrow a Deed and Policy of Title Insurance * * *. In the event same is not furnished within a reasonable time, then buyer shall have the right to cancel this agreement and his deposit is to be returned. * * * This 10,000 includes 3500 a/c inventory. Trust Deed payments to be $300 per month or more until paid, to include 6 percent interest." This was signed by the Schofields under notation that they agreed to sell on above terms, and by the Taggarts under notation that they agreed to purchase under said terms. Times and amounts of payments were not otherwise specified. The Taggarts paid $500 down and sundry payments aggregating some $8,500 during March and April 1956. Some of these payments were for personal property.

Mrs. Swital then had the Schofields sign escrow instructions for the sale of the real estate and personal property for the sums indicated, under which the Schofields agreed to hand the escrow holder deed, fire insurance policy, and other necessary instruments to be delivered and recorded upon receipt of note secured by deed of trust. Then followed the clause: "All funds shall be paid direct to Lucille Swital outside of escrow * * * when you can issue policy of title insurance * * *." The printed instructions contain many of the usual clauses

in addition to the foregoing. Mrs. Swital also had the Taggarts sign escrow instructions under which the Taggarts handed the title company $100 with agreement to supply note secured by deed of trust, etc. "which you are authorized to use when you can issue policy of title insurance [on the property described]."

The above escrow instructions were dated and filed with the title company March 5, 1956. Within a few days thereafter the title company began its title search and soon (apparently about March 10, 1956) determined that the title was not good and that it could not write a title policy. Apparently it gave no notice of that situation to the Taggarts. During March and April 1956 the Taggarts, without making any inquiry of the title company, proceeded to make payments to Swital, aggregating several thousand dollars. Upon discovering that title insurance would not issue they sued Schofields for rescission, with counts against Swital. Issues being joined in this action and in the action for damages against the title company, the cases were consolidated and tried with results above noted.

The court made findings dealing both with the action against the Schofields for rescission of the contract and the action against the title company. With regard to the latter, it found the execution of the contract of sale and the title instructions as above noted, the taking of possession by the Taggarts a short time after execution of the contract, that the Taggarts were not advised of the condition of the title till about May 29, 1956, that the Schofields and Swital received $10,672.51 and the note and trust deed for $18,500, that the agent of the title company promptly began the title search and knew within a matter of a few days that title insurance could not issue. It found further: "The plaintiffs did not make a request of defendant Nevada Title Guaranty Company other than signing the buyers' escrow instructions that the policy be furnished prior to the time that the injury was done." The court concluded that the Taggarts were not entitled to take anything as judgment against the title company.

It is this conclusion that is challenged by appellants.

The basis of such challenge is that the title company was under a duty to notify the Taggarts of the state of the title, because the escrow instructions stated that funds were to be paid outside of escrow, and because the title company then knew or should have known that the Taggarts were in a position of peril and that they would make payments "outside of escrow" directly to the Schofields unless promptly notified by the title company that the title was not good.

Appellants confess frankly that they are unable to cite any cases in point. They urge however that this court should impose upon the title company its duty to give prompt notice under the circumstances and its liability in tort to appellants for its breach of that duty. They urge that we so declare the law by analogy of the so-called insurance cases. Because we feel that there is no analogy that may be drawn from the insurance cases as applied to the facts in this case, we find it unnecessary to deal with those cases at length. It may be frankly conceded that in a number of cases fire insurance companies have been held liable in tort for undue delay in notifying an applicant of their rejection of his application for insurance. In an article by Prof. William L. Prosser, the distinguished author of Prosser on Torts, appearing in Vol. III, University of Chicago Law Review, 39, the author analyzes these cases as having been determined under various theories: that since the company has solicited the offer and since reasonable men would reject an offer promptly if there were no intent to accept it, its failure to reject within a reasonable time may be held to be an acceptance; that it is bound by principles of estoppel; that the duty of prompt notice results from the franchise issued to the company by the state; that its business is affected with a public interest; that once the defendant has entered upon the undertaking by some affirmative act, he may be liable for negligence if he abandons it or fails to use proper care. Estoppel, quasi contract and other principles have been used. The author feels that more recent decisions have abruptly altered the trend of those decisions, even

though the doctrine itself (imposing liability for unreasonable delay) is in turn of comparatively recent origin. The author lists the states in which liability has been supported and the jurisdictions in which it has been rejected. Apparently all cases pro and con up to the time of the article were examined.

Dean Prosser's article, published in 1936, refers to an article by Mr. Carl W. Funk, published in 75 University of Pennsylvania Law Review, 207, in 1927, which digests the principal insurance cases appearing up to that time, and reaches the conclusion (id. 226) "that if a survey be made ten years hence, it will be found that the insurer, in the majority of instances, will have been required to answer in damages for its negligent delay." Of interest also is the annotation appearing in 32 A.L.R.2d 487.

As applied to the present appeal however, we are of the opinion that these articles and the cases therein discussed are of academic interest only. There is a complete failure of analogy to the present situation. Even in Mr. Funk's article the basis for fixing liability resulting from delay in acting upon an application for insurance (whether in tort, quasi contract or any other of the theories advanced) is that the failure of the insurer to decide or to inform the applicant of its decision has prevented him from securing protection from another company. "If [the company] had acted promptly, the applicant would probably have been reimbursed for his loss: for had it accepted the application, it would have been liable to him on the policy of insurance; while had it rejected the proposal, the applicant might well have procured protection elsewhere." We may accept the fact that insurance has come to play an extensive part in our civilization and that the tendency leans more and more to shifting the burden of loss due to accident or catastrophe from the shoulders of the individual to those of the community or of a group within the community. See remarks of McNAMEE, C. J., speaking for this court in Johnson v. Brown, 75 Nev. 437, 345 P.2d 754. But the reason behind all this is that the individual applying for

insurance must rely on such insurance as the only protection available to him against possible loss. That situation is entirely absent from the present case. Here the Taggarts held in their own hands 100 percent insurance against loss resulting from failure of the sellers' title. Nothing in the contract of sale or in the escrow instructions required them to make any payments to the sellers before assurance of the title. They made the payments entirely at their own risk. It is not even necessary to emphasize their failure to make inquiry of the title company before making payments "outside of escrow."

Nor is there any analogy from the cases cited by appellants in which liability has been imposed in cases of bailment, agency, and possibly other situations. The judgment of the trial court in denying relief was correct.

Affirmed with costs.

McNAMEE, C. J., and PIKE, J., concur.